UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JORDAN ISAIAH MAURICE WATTS,

          Plaintiff,                                Hon. Robert J. Jonker

v.                                          Case No. 1:24-cv-1151

KALAMAZOO COUNTY, et al.,

          Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Jordan Watts, who is currently held as a pretrial detainee at the Kalamazoo County Jail (KCJ), filed this action on October 31, 2024 (complaint signed on October 15, 2024) pursuant to 42 U.S.C. § 1983 based on events that occurred at the KCJ between September through October 2024. (ECF No. 1.) After reviewing the complaint pursuant to 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c), the Court allowed the following claims to proceed: (1) First Amendment right-to-association claim against Defendant Lt. Michael Dziedzic; (2) First Amendment retaliation claims against Defendants Lt. Dziedzic and Assistant Prosecutor Chelsea Huber based on filing a lawsuit; (3) use of excessive force on September 13, 2024, against Defendants Sgt. Thomas Jelsomeno, Deputy Patrick Crump, Deputy Cameryn Ensor, Deputy Joseph Whisman, Deputy Gideon McKenzie, and Deputy Heather Marshall; and (4) Fourteenth Amendment Due Process change-in-conditions-of-confinement claims against Defendants Dziedzic and Huber. (ECF No. 10 at PageID.161.)

Presently before me is Defendants' Motion for Summary Judgment. (ECF No. 30.) The motion is fully briefed and ready for decision. For the reasons that follow, pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the motion be **GRANTED** and this action be **dismissed**.

## I.  Background

### A.    The Personal Protection Order and Criminal Case

On July 5, 2024, Watts's wife obtained a personal protection order (PPO) against him effective through December 1, 2024. (ECF No. 30-2 at PageID.267.) The PPO prohibited Watts from, among other things, sending his wife mail or other communications, contacting her by telephone, and threatening (including through a third party) to kill or physically injure her. (*Id.*) After Watts failed to comply with those conditions, a PPO violation case was filed in the 8th District Court. On August 22, 2024, the court set a hearing on the charges for August 26, 2024, and again ordered that Watts have no contact with his wife. (ECF No. 30-3 at PageID.269.) At the August 26 hearing, Watts pled no contest and was sentenced to jail for six days, with credit for time served. (*Id.* at PageID.270.)

Watts was also charged in a separate criminal case with six counts of unlawful imprisonment, one count of aggravated stalking, three counts of assaulting, resisting or obstructing a police officer, and one count of domestic violence, with a habitual offender notice (ECF No. 30-26 at PageID.420–21; ECF No. 30-29), and was booked into KCJ on August 22, 2024. (ECF No. 30-4 at PageID.274.) A preliminary examination was scheduled for September 12, 2024. Defendant Huber appeared to present the case through her witnesses, Watts's wife and a Kalamazoo Department of Public Safety (KDPS) detective who had been working the case. (ECF No. 30-26 at PageID.421.) Prior to the hearing, the detective informed Huber that Watts had been calling friends and family from the jail and having them call or visit Watts's wife in order to influence her testimony. Huber asked the detective to prepare a report with the available

2

information so that she could determine whether Watts's actions constituted witness intimidation. (*Id.*) The preliminary examination did not occur that day because Watts's attorney—at Watts's request—informed the judge, Hon. Kathleen Hemingway, that Watts had named her in a Section 1983 action and wanted Judge Hemingway to recuse herself from the case. (ECF No. 30-17 at PageID.357; ECF No. 30-26 at PageID.421.) Judge Hemingway therefore adjourned the matter until September 19, 2024, to allow the parties to brief the issue. (ECF No. 30-17 at PageID.358.) At the September 19, 2024 hearing, Watts's counsel acknowledged the "mostly tenuous grounds" for recusal based on Watts's assertion of a wide-ranging government conspiracy and search warrants that Judge Hemingway had issued in connection with a federal case against Watts. (ECF No. 30-18 at PageID.365.) After addressing the various proffered grounds for recusal, Judge Hemingway denied the motion. (*Id.* at PageID.366–74.)

**B.      Watts's KCJ Housing Assignments and Misuse of his Phone Privileges**

Watts was initially assigned to cell B-West 06 in the general jail population after he was booked into KCJ on August 22, 2024. (ECF No. 30-4 at PageID.274.) On September 12, 2024, KDPS detectives informed Lt. Dziedzic that Watts had been calling third parties asking them to contact his wife to intimidate her or persuade her testimony. (ECF No. 30-6 (Watts KCF call log); ECF No. 30-8 at PageID.305; ECF No. 30-27 at PageID.426.) Based on the detectives' request, Lt. Dziedzic decided to revoke Watts's access to phone communication through his jail-issued tablet and the telephones affixed to the jail walls. (ECF No. 30-7.) Because Watts was not calling his wife directly, simply blocking access to her phone number would not have addressed the issue. (ECF No. 30-27 at PageID.426.) The following day, Lt. Dziedzic informed Watts's criminal defense attorney that Watts's phone privileges had been revoked based on the KDPS detectives' request. (ECF No. 30-8.)

The initial plan upon Watts's return from the September 12, 2024 court hearing was to transfer him to cell B-North BN01 segregation so that jail staff could control his access to phones/tablets, but he sat on the ground in the hallway to prevent the move, so instead he was safely moved to cell P228. (ECF No. 30-27 at PageID.427.) On September 13, 2024, Watts was moved to a detention holding cell, "hot cell" 2, due to suicidal statements, where he remained until he was cleared by mental health providers on September 16, 2024. (*Id.*)

On September 16, 2024, Watts was moved to B-North BN01, where he remained until November 13, 2024. Cell BN01 is a Special Purpose Cell available for administrative segregation and protective custody. Permitted uses unrelated to discipline include protecting the assigned prisoner/other prisoners from each other; ensuring the safety, security, or order of the jail facility; and isolating prisoners during investigation of criminal conduct occurring with the facility. Watts was placed in cell BN01 to control his phone access and prevent communications with third parties intended to reach his wife. (*Id.* at PageID.428.) Although Watts could not make outgoing calls while in this cell, Defendants contend that he had access to his incoming mail, which is digitized and available to inmates on their tablets, and they present Watts's activity log showing that he received mail while housed in cell BN01. (ECF No. 1 at PageID.32; ECF No. 30-5.) Watts disputes that he "always" had access to his mail on his tablet as Defendants assert (ECF No. 43 at PageID.498), but he admits that he had access to the law library on his tablet.[1] (*Id.*) In addition, KCJ set up a procedure to allow Watts to maintain telephone contact with his defense attorneys.

---

[1] A grievance response that Watts attached to his complaint indicated that he had access to both the law library and his incoming mail on his tablet. (ECF No. 1-1 at PageID.32.) There is no indication that Watts ever filed a grievance claiming that he lacked access to his mail through his tablet. Watts admits, however, that he received some legal mail and was able to send letters to his attorney around the end of September. (ECF No. 43 at PageID.498–99.) Moreover, Watts was able to mail his complaint to this Court to initiate this action while housed in cell BN01.

(ECF 30-19.) Judge Hemingway had instructed Huber "as an officer of the court" to contact KCJ to facilitate Watts's phone access to his attorneys, which she did. (ECF 30-18 at ECF No.376; 30-26 at PageID.422.) Nonetheless, KCJ officials determined that Watts still was able to circumvent the restrictions by telling jail staff that he was calling his attorney, when in fact he was calling his girlfriend, and by stealing and using another prisoner's pin.[2]  (ECF No. 1-1 at PageID.30; ECF No. 30-9; ECF No. 30-11.)

During this time, the KDPS detectives continued to investigate a possible witness intimidation case, and on October 17, 2024, Defendant Huber authorized witness intimidation charges against Watts based on his conduct while detained at KCJ. (ECF No. 30-12; ECF No. 30-26 at PageID.422.) Pretrial orders issued in the case on October 18, 2024, and October 29, 2024, restricted Watts's jail telephone privileges to his attorney and public defender representatives. (ECF 30-12 at PageID.322, 326.) Those documents were placed in Watts's jail file. (ECF No. 30-27.) Judge Hemingway dismissed the witness intimidation case on November 7, 2024. (ECF No. 30-12 at PageID.329.) Watts's phone privileges were not immediately restored that day because he had received a misconduct charge on November 6, 2024, that resulted in a ten-day restriction of privileges lasting until November 17, 2024. (ECF No. 30-14.)

On November 13, 2024, Watts was moved to Pod 2, cell P214, and he was returned to the general population on November 16, 2024, when he was moved to B-West, cell BW16. (ECF No. 30-27 at PageID.428.) The phone and tablet restrictions were lifted on November 13, 2024, following dismissal of the witness intimidation case. (ECF No. 30-15.) Thus, Watts again had

---

[2] In response to Watts's calls to his girlfriend, Huber, KCJ staff, and Watts's defense attorneys devised a way to prevent further similar incidents by having KCJ staff contact the defender's office when Watts wished to contact his attorneys and set up an appointment for Watts to speak with his counsel. (ECF No. 30-19.)

regular phone privileges, subject to any person-specific restrictions in connection with the PPO and the pending unlawful imprisonment criminal case.

### C.    The September 13, 2024 Use of Force Incident

On September 13, 2024, while in cell P228, Watts began pressing the emergency call button and kicking the cell door repeatedly until he hurt himself. (ECF No. 1 at PageID.5; ECF No. 30-21 at PageID.388–89.) Deputies Whisman and Ensor responded to a radio call about this activity. Upon arrival, Deputy Whisman found Watts on the floor by the cell door holding his ankle. (ECF No. 30-21 at PageID.395.) Watts told Deputy Whisman that he would not stop kicking the cell door until he could speak to a sergeant or with community mental health and that he had intentionally hurt himself and would continue to do so. (ECF No. 1 at PageID.6; ECF No. 30-21 at PageID.395.) Based on Watts's statements, Deputy Whisman determined that Watts should be placed in a "hot cell" in a suicide gown as preventative measures. (*Id.*) Deputy Whisman helped Watts to his feet, handcuffed him without incident, and assisted him down the stairs and towards the hot cell while Deputy Ensor went to retrieve a suicide gown. (*Id.*; ECF No. 30-30, Ex. DD.)[3]

During the escort, Watts told Deputy Whisman, "I apologize in advance for what I am about to do," and "I am going to make you hurt me." (ECF No. 30-21 at PageID.395; *see also* ECF No. 1 at PageID.6 ("On the way [to the hot cell] I confided in Whisman that I think the staff wants to hurt me, [I'm going to] make them hurt me an[d] I[']m sorry.").) In response to these comments, Deputy Whisman signaled to non-party Deputy Nathan Willard to come help. (ECF No. 30-21 at PageID.395.) As Whisman and Watts approached the "hot cell," Watts told Deputy Whisman that he was not going into the cell and began to resist movement. The deputies each grabbed one of

---

[3] Defendants support their motion and description of the incident with body camera video (ECF No. 30-30) from Defendants Ensor (Ex. CC), Jelsomeno (Ex FF), and Marshall (GG) and non-Defendants Blythe-Patton (DD) and Dennany (EE).

6

Watts's arms and turned him around but Watts still resisted. Non-party Deputy Adam Dennany, who had come from behind the intake desk, called for assistance from the on-duty sergeant, Defendant Jelsomeno. (ECF No. 30-30, Exs. DD, EE.)

Watts went limp and collapsed to his side onto the floor, taking Deputies Whisman and Willard with him. As Deputies Whisman, Willard, and Dennany were on the ground attempting to secure Watts, Sgt. Jelsomeno approached from behind, grabbed Watts's left leg, and applied an ankle lock against Watts's left buttock while asking Watts if he was done resisting. (*Id.*)[4] Sgt. Jelsomeno released the ankle lock moments later after the deputies told him that Watts was handcuffed. During the struggle, several deputies grabbed an emergency restraint chair and placed it nearby. Three deputies tried to stand Watts up but were unable to do so because Watts dropped his legs from under him and slid back to the ground. (ECF No. 30-30, Exs. DD, EE.) Four deputies and Sgt. Jelsomeno then lifted Watts off the floor but still had trouble moving him because he straightened his legs out in a manner that prevented them from getting closer to the chair. Watts then put a leg out in an apparent effort to kick the chair away with his feet. (*Id.*, Ex. FF.)

After finally getting Watts to the chair, multiple deputies struggled for almost three minutes to strap him in because he resisted by tightening his muscles, holding his midsection out of the chair, and not sitting flush with the seat despite repeated commands to slide his butt back in the seat. Deputies Crump, Willard, and Dennany, located by Watts's legs, worked to fasten and secure the leg straps, while Deputy Whisman held Watts's arms together and in place as Deputy Marino attempted to fasten the waist strap. (*Id.*, Ex. EE.) Because Watts continued to hold his body away

---

[4] Sgt. Jelsomeno wrote in his report that when asked if he was done resisting, Watts responded that he was not done. (ECF No. 30-22 at PageID.401.) The video from Sgt. Jelsomeno's body camera appears to confirm this version, as in response to Sgt. Jelsomeno's question if Watts was done, Watts appears to respond "nah." (ECF No. 30-30, Ex. FF.)

from the chair, impeding the deputies' efforts to fasten the waist strap, non-party Deputy Joshua Lopez pushed his knee into Watts's left side to force his body back into the seat to allow the other deputies to fasten the strap. Deputy Lopez was unable to move Watts's body, so Sgt. Jelsomeno administered three quick knee strikes to the right side of Watts's waist to allow the other deputies to tighten the straps. Within about ten seconds, another deputy yelled, "got it," indicating that the waist strap was secured. (ECF No. 30-22 at PageID.401; ECF No. 30-30, Exs. EE and FF.) Sgt. Jelsomeno then got off of Watts and the deputies unlocked the handcuffs and secured his arms to the chair. (*Id.*)

During the struggle, Deputy Marshall applied a hypoglossal hold, or pressure point on the hypoglossal nerve, by placing her hands on either side of Watts's jaw to gain compliance for placement in the chair. Video shows that Deputy Marshall maintained her hand placement on either side of Watts's jaw and did not restrict his airflow or apply pressure to his windpipe. (*Id.*) After about a minute, non-party Deputy Jesus Zuniga took over for Deputy Marshall using the same technique, also maintaining his hand placement on either side of Watts's jaw. Deputy Zuniga released the hold when Watts relaxed and became compliant but resumed it a short time later when he tensed up once again as the deputies were fastening the straps. (*Id.*)

Once Watts was secured in the restraint chair, Deputy Dennany wheeled him into cell HC02, where Sgt. Jelsomeno spoke with Watts about what led up to his resistance. (*Id.*) During this time Deputies McKenzie and Dennany loosened the straps after noticing they were too tight. (*Id.*)

## II.  Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty*

8

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Where uncontroverted video evidence 'so utterly discredit[s]' one party's version of events, so that no reasonable jury could believe him or her, the facts should be viewed 'in the light depicted by the videotape.'" *King v. City of Rockford*, 97 F.4th 379, 389 (6th Cir. 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

### III.  Discussion

Defendants contend that they are entitled to qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant violated a right so clearly established "that every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a

9

reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

The second prong of the qualified immunity analysis focuses on the state of the law at the time the alleged violation occurred. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). It is not enough to show that the right is established at "'a high level of generality.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* at 993 (quoting *White*, 580 U.S. at 79). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019). "An official's conduct flunks this 'clearly established' test only if the conduct's unconstitutionality was 'beyond debate' when the official acted, such that any reasonable person would have known that it exceeded constitutional bounds." *DeCrane v. Eckart*, 12 F.4th 586, 599 (6th Cir. 2021). To determine whether a right is clearly established, a district court within the Sixth Circuit may consider binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point. *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Risbridger v. Connelly*, 275 F.3 565, 569 (6th Cir. 2002)).

### A. First Amendment Claims

### 1. Right to Associate

Watts alleges that Lt. Dziedzic violated his First Amendment right to associate with friends, family, and other prisoners. He claims that the deprivation resulted from being held in an isolation cell and being denied incoming mail, telephone privileges, and visitors.

"[P]roblems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).[5]

"An inmate does not retain rights inconsistent with proper incarceration," *Overton*, 539 U.S. at 131 (citations omitted), and "freedom of association is among the rights least compatible with incarceration." *Id.* "Some curtailment of that freedom must be expected in the prison context." *Id.* When jail officials impose limitations on pretrial detainees that impinge on constitutional rights, "the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment[.]" *Block v. Rutherford*, 468 U.S. 576, 583 (1984) (citing *Bell*, 441 U.S. at 535). If not, the determination "generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* at 584 (internal quotation marks and brackets omitted).

---

[5] In its July 7, 2025 Opinion on initial review of the complaint, the Court noted that while *Overton* addressed the limits of freedom of association for convicted prisoners, the same considerations apply equally to pretrial detainees such as Watts. (ECF No. 10 at PageID.128 n.7.) *See Bell*, 441 U.S. at 547 n.28 ("There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order.").

Regarding telephone usage, it is well established that "a prisoner's right to telephone access is 'subject to rational limitations in the face of legitimate security interests of the penal institution.'" *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994) (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)); *see also Brown v. Davis*, No. 1:18-cv-1322, 2019 WL 211070, at *4 (W.D. Mich. Jan. 16, 2019) (observing that "an institution may place limits on prisoner contact with family and friends if such limits "bear a rational relationship to legitimate penological interests," such as rehabilitation and the maintenance of security and order.") (quoting *Overton*, 539 U.S. at 132). In its screening opinion, the Court observed that strictly limiting Watts's freedom of association may well have been justified by the security concerns raised after he refused KCJ staff instructions to enter cells on September 12 and 13 and/or by requests of officers and prosecutors investigating Watts, but Lt. Dziedzic would ultimately have to show legitimate penological interests justified the restrictions. (ECF No. 10 at PageID.9–10.) Lt. Dziedzic has met that burden by presenting evidence that he authorized the telephone/tablet restrictions based on a request from KDPS detectives investigating Watts's alleged intimidation of his ex-wife through phone requests to third parties. (ECF No. 30-7; ECF No. 30-8; ECF No. 30-27 at PageID.425–26.) Because Watts was recruiting others to contact his wife rather than contacting her directly, blocking only her telephone number would not have addressed the issue. Moreover, KCJ has a legitimate penological interest in ensuring that inmates do not abuse their phone privileges in the jail to harass or intimidate others, especially when the misuse is directed at a victim with an active PPO against the inmate.

As for housing Watts in an isolation cell, although it appears that Lt. Dziedzic was not directly involved in the decision (ECF No. 30-27 at PageID.428), the cell placement was rationally related to KCJ's interest in preventing Watts from violating the PPO by recruiting others to contact

his wife. Restricting Watts's interaction with other inmates through isolation was reasonable given that KCJ staff was aware of his possible use of another prisoner's pin number to circumvent the phone restrictions. (ECF No. 1-1 at PageID.30 ("We . . . have documentation via the tablets you used other inmate log in credentials to circumvent the tablet system.").)

Watts contends the restriction was excessive because he was unable to receive mail from his friends and family, had access only to the law library on his tablet, and did not have access to his counsel. He argues that, although the court instructed Defendant Huber to ensure that he had access to his counsel, "that still never happened[.]" (ECF No. 43 at PageID.501.) Watts further asserts that he was unable to order stamps to send mail out until the end of October 2024, although he admits that he did send mail to courts around October 14 and 15, 2024, using stamps that a chaplain had given him. (*Id.* at PageID.502.)

Regardless, Watts fails to show that Lt. Dziedzic violated his First Amendment rights. While Lt. Dziedzic did restrict Watts's phone privileges for a legitimate purpose by blocking his access to his wall phone and phone access on his tablet (ECF No. 30-7; ECF No. 30-8; ECF No. 30-27 at PageID.426), there is no evidence he had anything to do with restricting Watts's access to his mail on his tablet, his access to his counsel, or his access to postage stamps. Moreover, contrary to Watts's assertion, the September 27, 2024 email exchange among Huber, Warren Misner at KCJ, and public defender Matthew Wait shows that Huber and KCJ staff collaborated with Watts's counsel to ensure a workable plan to allow him access to his counsel while preventing him from bypassing the restrictions.[6] (ECF No. 30-19.)

Watts also appears to contest the validity and necessity of the phone restrictions. First, he suggests that the PPO restrictions were invalid because the PPO was not served on him. (ECF No.

---

[6] Watts also admits that he "got pulled out for attorney calls[.]" (ECF No. 43-7 at PageID. 547.)

43 at PageID.492.) But this argument is irrelevant. While the judge raised the sufficiency of the stalking charge at the preliminary examination because there was no indication the PPO had been served on Watts, it is undisputed that the PPO was still in effect, and Watts was well aware of it as of the end of August 2024. Thus, he was subject to its restrictions. Next, Watts admits that he used the phone to ask others to contact his wife, but asserts that he only instructed his family and girlfriend "to offer her support." (*Id.* at PageID.503.) Even if true, the PPO precluded Watts from *any* contact with his wife, directly or through others, and Lt. Dziedzic had information from KPDS detectives indicating that Watts was attempting to influence/intimidate his wife. In short Watts fails to show that the restrictions from September 12 through November 2024 amounted to punishment or were excessive in relation to the purpose they were intended to serve.

Finally, Lt. Dziedzic is entitled to qualified immunity because Watts fails to demonstrate that, as of September 2024, the law was so clearly established that Lt. Dziedzic was on notice that the phone/tablet restriction, or placement of Watts in an isolation cell to prevent him from violating the PPO, violated Watts's clearly established rights.

### 2. Retaliation

Watts alleges that Defendants Huber and Lt. Dziedzic retaliated against him by placing him in isolation after he told Judge Hemingway through counsel at the September 12, 2024 hearing that he had filed, or planned to file, a lawsuit against her. To establish a prima facie case of retaliation, Watts must prove the following elements: (1) he engaged in protected conduct; (2) Defendants took an adverse action against him "that would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) the adverse action was taken (at least in part) because of the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). To satisfy the causal connection requirement, a plaintiff must show that the defendant's

retaliatory motive was "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).

Defendants contend that Watts's claim fails as to all three elements. I find it unnecessary to address the second element because the claim fails on both the first and third elements.[7] Regarding protected conduct, there is no evidence that Watts had filed a lawsuit against Judge Hemingway in any court on August 19, 2024, as he alleged in his complaint. (ECF No. 1 at PageID.5.) As the Court noted in its screening opinion, the only lawsuit that Watts filed in this Court that matches the description he provided in his complaint is Case No. 1:25-cv-50, filed on January 13, 2025—several months after his counsel raised the lawsuit issue to Judge Hemingway. (ECF No. 10 at PageID.133 n.9.) Nonetheless, Watts says that threatening a lawsuit is protected conduct. (ECF No. 43 at PageID.504.) Be that as it may, a threat to file a lawsuit is only protected if the claim is nonfrivolous. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) ("Herron's pursuit of legal claims against CCCF officials in the instant case and in previous cases was protected conduct only to the extent that the underlying claims had merit."). A claim is frivolous if it lacks an arguable or rational basis in law or fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Such claims include "claims for which the defendants are clearly entitled to immunity[.]" *Huey v. Raymond*, 53 F. App'x 329, 330 (6th Cir. 2002) (citing *Neitzke*, 490 U.S. at 327–28). When Watts's

---

[7] Defendants' argument that Watts fails to show adverse action because he was not deterred from filing this action or the January 2025 lawsuit while detained at KCJ is contrary to Sixth Circuit law that "[a]n adverse action is one that is '*capable* of deterring a person of ordinary firmness,' from exercising the constitutional right in question." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002)); *see also Ball v. Evers*, No. 19-10315, 2021 WL 3164273, at *10 (E.D. Mich. July 27, 2021) ("Even if Ball himself was not intimidated, the measure of adversity is objective, that is, whether a person of ordinary firmness would be deterred, not whether the plaintiff himself actually was deterred." (cleaned up) (quoting *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010))).

15

lawsuit finally made its way to this Court in January 2025, the claim against Judge Hemingway was dead on arrival. It was dismissed soon after filing because Judge Hemingway's act of "[a]pproving search warrants [was] clearly a judicial act," entitling her to absolute judicial immunity. Case No. 1:25-cv-50, ECF No. 10 at PageID.75. Watts did not engage in protected activity because his claim against Judge Hemingway was frivolous.

As for the third element, Watts's theory seems to be—indeed must be—that Huber contacted Lt. Dziedzic or some other KJC staff following the September 12, 2024 hearing in response to Watts's announced lawsuit. But Huber states that she did not speak with Lt. Dziedzic about Watts or his filed/threatened lawsuit on September 12, 2024, did not tell anyone at the Kalamazoo County Sheriff's Office to take any actions against Watts because he had filed/threatened a lawsuit, was not involved in the decision to remove Watts's phone privileges on September 12, 2024, and did not ask anyone at the Kalamazoo County Sheriff's Office to remove his phone privileges. Huber states she learned that Watts's privileges had been revoked after the fact. (ECF No. 30-26 at PageID.421–22.) For his part, Lt. Dziedzic states that he did not speak with Huber or anyone else from the prosecutor's office about Watts on September 12, 2024, but did receive a request from KDPS detectives that day to revoke Watts's telephone privileges. (ECF No. 30-27 at PageID.425–26.) Lt. Dziedzic further states that he was not aware of any lawsuit by Watts on September 12, 2024, and did not learn of his lawsuit against Kalamazoo County and others until December 11, 2024, when he received an email about the case. (*Id*. at PageID.429; ECF No. 30-28.)

Against this evidence, Watts presents only conclusory assertions, hearsay, and a request that the Court consider "the totality of the circumstances surrounding [his] claim." (ECF No. 43 at PageID.505.) Watts argues that Huber was involved in the previous federal case and was aware

that he was being targeted by law enforcement, suggesting that she could have surmised the basis for his claims. (*Id.*) This assertion is not only speculation, but also fails to show a causal connection. Watts also points to his declaration stating that Sgt. Jelsomeno and others told him that the jail works hand-in-hand with the prosecutor's office, that the prosecutor's office wanted Watts housed in isolation, and that Huber said that the court had ordered it. (ECF No. 43-7 at PageID.545, 547.) These statements, however, are inadmissible hearsay that cannot be considered in deciding a motion for summary judgment. *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). More importantly, regardless of admissibility, they simply do not show that Watts suffered an adverse action due to his counsel's statements at the September 12, 2024 hearing regarding his lawsuit.

In other words, Watts fails to provide evidence establishing the key link in his claim—Huber's initiation of revocation of his phone privileges and/or cell placement *because of* his lawsuit against Judge Hemingway. Accordingly, Defendants are entitled to summary judgment on this claim.

### B.    Due Process Change in Conditions of Confinement

In its screening opinion, the Court concluded that Watts had alleged sufficient facts to proceed on a due process change in conditions claim under a pretrial detainee variant of the "atypical and significant hardship" standard set forth in *Sandin v. Conner*, 515 U.S. 472 (1995). (ECF No. 10 at PageID.151–53.) However, the Court left open whether the claim is properly analyzed under the *Sandin* standard or under *Bell*'s "punishment" standard set forth above. (*Id.* at PageID.154.) For the reasons that follow, I conclude that the claim fails under either standard, and in any event, Lt. Dziedzic is entitled to qualified immunity.

17

As an initial matter, for the reasons set forth in my analysis of the retaliation claim, Defendant Huber is entitled to summary judgment on this claim because Watts fails to present any competent evidence to show that Huber was involved in any decision pertaining to Watts's phone privileges or cell assignment at KCJ. Lt. Dziedzic also argues that he was not involved in Watts's housing decision, but his declaration is not entirely clear on that issue as he states that he was "not *directly* involved in the decision to return Jordan Watts to cell BN01 on September 16, 2024, or keep him there until November 13, 2024." (ECF No. 30-27 at PageID.428 (italics added).) This statement, which does not disclaim *all* involvement, does not preclude the possibility that Lt. Dziedzic had some indirect involvement in the decision.

Under *Sandin*, for placement in administrative segregation to be actionable, a plaintiff must show that the circumstances of his confinement rose to the level of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. Mere placement in administrative segregation is insufficient to demonstrate "an 'atypical and significant' hardship implicating a protected liberty interest." *Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010). Instead, a plaintiff must show "extreme circumstances," such as being subjected to indefinite administrative segregation. *Id.* Courts generally consider the nature and duration of a stay in segregation in determining whether it imposes an atypical and significant hardship. *See Harden-Bey v. Rutter*, 524 F.3d 789, 795–96 (6th Cir. 2008). In addition, the Sixth Circuit considers the totality of the following factors when deciding whether a prisoner's confinement to segregation imposes an atypical and significant hardship that implicates a liberty interest: (1) the reasons for a prisoner's continued confinement in segregation; (2) the conditions of a prisoner's confinement "'in relation to the ordinary incidents of prison life;'" and (3) the

impact the confinement will have on the inmate's sentence. *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998) (quoting *Sandin*, 515 U.S. at 483).

Based on the present evidentiary record, Watts's placement in segregation for 65 days does not meet the *Sandin* standard for a protectable liberty interest under the Due Process Clause. First, the length of his stay in segregation did constitute an atypical and significant hardship. *See Finley v. Huss*, 102 F.4th 789, 813 (6th Cir. 2024) (noting that three months in administrative segregation "falls comfortably within the duration that we've deemed part of the ordinary incidents of prison life"); *Powell v. Washington*, 720 F. App'x 222, 226 (6th Cir. 2017) (holding that "six-month confinement in administrative segregation is insufficient to constitute an atypical and significant hardship and therefore does not implicate [ ] due process rights"); *Joseph*, 410 F. App'x at 868 (finding that 61 days in segregation is not atypical and significant); *Bradley v. Evans*, No. 98-5861, 2000 WL 1277229, at *5–7 (6th Cir. Aug. 23, 2000) (14 months of segregation did not constitute atypical and significant hardship); *Collmar v. Wilkinson*, No. 97-4374, 1999 WL 623708, at *3 (6th Cir. Aug. 11, 1999) (neither eight months administrative segregation nor 14 days of disciplinary segregation constituted an atypical and significant hardship). Second, even if the length of Watts's stay in segregation was atypical, Watts's suspected misuse of his phone privileges to influence or intimidate his wife through third persons "constituted a good reason for the length of his stay." *Jones v. Raye*, No. 12-6568, 2014 WL 10319865, at *2 (6th Cir. June 3, 2014) (holding that the plaintiff's two and one-half year stay in segregation, even if atypical, was justified by the plaintiff's actions causing serious injuries to corrections officers). In his response, Watts reiterates his retaliation allegations to refute any justification for holding him in segregation, noting that he was placed in segregation on the same day he engaged in protected conduct. (ECF No. 43 at PageID.507.) But as set forth above, Watts's retaliation claim is conclusory and

19

unsupported, as the evidence shows that the decision to place Watts in administrative segregation followed KDPS detectives' request to revoke Watts's phone privileges. In other words, there is no evidence showing that the cell change had anything to do with Watts's threat of filing a lawsuit against Judge Hemingway.

Watts's due process claim also fails if, as Watts contends is proper, it is analyzed under *Bell*. (*Id.* at 508–09.) As noted above, the proper inquiry under *Bell* is whether the challenged practice constitutes punishment, which can be shown either through an "expressed intent to punish," 441 U.S. at 538, or through proof that the action at issue is not "rationally related to a legitimate nonpunitive governmental purpose" or "appear[s] excessive in relation to that purpose." *Id.* at 561. First, there is no evidence of an expressed intent to punish. Rather, as Lt. Dziedzic states, the decision to move Watts to cell BN01 segregation was done to further KCJ's security, order, and control interests and to stop Watts's suspected misuse of his phone privileges to intimidate or influence his wife. (ECF No. 30-27 at PageID.428.) In fact, KCJ staff initially attempted to move Watts to cell BN01 on September 12, 2024, the same day KDPS detectives requested jail staff to revoke Watts's phone privileges, but he physically refused the move. Watts was eventually moved into cell BN01 on September 16, 2024, where he remained until November 13, 2024, after the witness intimidation case was dismissed, and Watts had finished serving his misconduct-related jail telephone privilege restriction. Given these circumstances, Watts fails to show that the segregation assignment was not rationally related to a legitimate security interest, and there is no indication that confinement to a segregation cell was excessive in relation to KCJ's legitimate interest. Although Watts appears to suggest that KCJ should have restored his phone privileges and moved him back to general population or a less-restrictive cell assignment after the preliminary examination on September 24, 2024, the witness tampering investigation was still

ongoing, and the PPO restrictions remained in place, and pretrial orders entered after the witness intimidation charges were filed on October 17, 2024, continued the same phone restrictions that justified the intended move to segregation on September 12, 2024.

Lt. Dziedzic contends that he is entitled to qualified immunity on this claim because it is an open question in the Sixth Circuit whether pretrial detainee change in conditions of confinement procedural due process claim are governed by the *Sandin* "atypical and significant hardship" standard or the *Bell* punishment standard. The Sixth Circuit acknowledged this uncertainty in its unpublished decision in *Johnson v. Grayson County, Kentucky Detention Center*, No. 21-5772, 2022 WL 3479501 (6th Cir. May 27, 2022), which the Court cited in its screening opinion. (ECF No. 10 at PageID.152 n.15.) As previously discussed, the two standards are materially different, and given the uncertainty in the Sixth Circuit as to which standard applies to pretrial detainees, the law was not sufficiently established to give officials "fair and clear warning . . . about what the law requires." *Arrington-Bey*, 858 F.3d at 993 (internal quotation marks omitted). *See Spears v. McCraw*, No. 20-50406, 2021 WL 3439148, at *2 (5th Cir. Aug. 5, 2021) (holding that the defendants were entitled to qualified immunity on the plaintiff's First Amendment retaliation claim because it was an "open question" in the Fifth Circuit whether a performance improvement plan satisfies the "materially adverse" standard for retaliation claims based on protected speech); *Kozlowski v. Van Rybroek*, 771 F. App'x 662, 664 (7th Cir. 2019) (affirming the district court's grant of qualified immunity where "the case law did not specifically establish which of two standards governed the constitutionality of [a prisoner mail] restriction"); *Harrell v. Southern Or. Univ.*, 474 F. App'x 665, 666 (9th Cir. 2012) (holding that the appellees were entitled to qualified immunity because "'the appropriate speech standard for college and graduate students [sic] speech

remains an open question in this circuit'" (quoting *Brown v. Li*, 308 F.3d 939, 960 (9th Cir. 2002)).

Accordingly, Lt. Dziedzic is entitled to qualified immunity on this claim.

### C.    Excessive Force

Watts's excessive force claim is based on the September 13, 2024 incident. As set forth in

the screening opinion, because Watts was a pretrial detainee, his excessive force claims are

analyzed as Fourteenth Amendment due process claims pursuant to the standard set forth in

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015). The claim does not feature the Eighth

Amendment's subjective prong. Instead, the relevant inquiry is whether the force purposely or

knowingly used against the prisoner was objectively unreasonable. *Id.* at 398–99; *see also Coley

v. Lucas Cnty.*, 799 F.3d 530, 538 (6th Cir. 2015) (citing *Kingsley*). This inquiry is "highly fact-

dependent" and "must take into account the 'perspective of a reasonable officer on the scene,

including what the officer knew at the time, not with the 20/20 vision of hindsight.'" *Coley*, 799

F.3d at 538 (quoting *Kingsley*, 576 U.S. at 397). It must also consider the government's "legitimate

interests" in managing correctional facilities in order "to preserve internal order and discipline and

to maintain institutional security." *Coley*, 799 F.3d at 538 (internal quotations omitted). The

*Kingsley* Court further provided:

> Considerations such as the following may bear on the reasonableness or
> unreasonableness of the force used: the relationship between the need for the use
> of force and the amount of force used; the extent of the plaintiff's injury; any effort
> made by the officer to temper or to limit the amount of force; the severity of the
> security problem at issue; the threat reasonably perceived by the officer; and
> whether the plaintiff was actively resisting. We do not consider this list to be
> exclusive. We mention these factors only to illustrate the types of objective
> circumstances potentially relevant to a determination of excessive force.

*Kingsley*, 576 U.S. at 397 (internal citations omitted). Both *Kingsley* and *Coley* stated that "pretrial

detainees cannot be subjected to 'the use of excessive force that amounts to punishment,' precisely

because they 'cannot be punished at all.'" *Coley*, 799 F.3d at 538 (quoting *Kingsley*, 576 U.S. at

400). "The calculus of reasonableness must embody allowance for the fact that [jail] officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The analysis therefore includes a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (internal quotation marks omitted). At bottom, a court's focus is not on the extent of the injury, but "whether 'gratuitous violence' has been inflicted." *Coley*, 799 F.3d at 539 (quoting *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006)). "When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020)).

Before considering each Defendant's use of force during the incident, I address two preliminary matters. First, Watts does not argue that Defendants' use of a restraint chair was unreasonable or violated clearly established law. There is no basis to conclude that it violated Watts's constitutional rights. "A restraint chair may be properly used to restore control over an individual who is in custody or to prevent such an individual from harming himself." *Fletcher v. Vandyne*, No. 2:07-CV-325, 2009 WL 1687956, at *14 (S.D. Ohio June 11, 2009) (citing *Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000); *Morrison v. Stephenson*, No. 2:06-cv-283, 2008 WL 114890, at *3 (S.D. Ohio, Jan. 9, 2008); *Pillette v. County of Otsego*, No. 06-10536, 2007 WL 851330, *9 (E.D. Mich., Feb. 27, 2007)). As the video evidence clearly demonstrates, Watts impeded the deputies' efforts to move him into the hot cell by intentionally falling to the ground and refusing to comply with orders to stand up. A restraint chair was one of the few options available to the deputies to move a noncompliant prisoner even a short distance into a cell.

23

Second, pertinent to the excessive force inquiry is whether Watts's resistance was active or passive. This determination is key because "'[a]ctive resistance to an officer's command can legitimize' an officer's use of force." *Cretacci v. Call*, 988 F.3d 860, 870 (6th Cir. 2021) (quoting *Hanson*, 736 F. App'x at 531). Although Watts concedes that he told Deputy Whisman that he refused to go into the hot cell, "tensed up" and "sat/laid" down, he argues that his resistance can only be characterized as passive because he was handcuffed and not belligerent, threatening, or kicking at the deputies. (ECF No. 43 at PageID.510.)

Most of the Sixth Circuit's decisions addressing the distinction between passive and active resistance occur in the Fourth Amendment arrest context and typically concern application of handcuffs. *See*, *e.g.*, *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015); *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). As summarized in *King v. City of Rockford*, 97 F.4th 379 (6th Cir. 2024), on the passive end of the spectrum, force used against "a non-compliant suspect who lacked any 'outward manifestation' that 'suggested volitional and conscious defiance' toward the officer" is deemed unreasonable. *Id.* at 396 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 533–34 (6th Cir. 2013)). "On the other end of the spectrum, [the Sixth Circuit] ha[s] deemed tasers, knee strikes, and other force necessary to subdue suspects justified where the suspects repeatedly refused to comply and physically resisted arrest." *Id.* (citing *Earnest v. Genesee Cnty.*, 841 F. App'x 957, 960–61 (6th Cir. 2021)). Put differently, passive resistance "entails a 'lack of physical resistance or verbal antagonism,'" *id.* (quoting *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017)), while active resistance features "'physical force, a show of force, or verbal hostility coupled with failure to comply with police orders.'" *Id.* at 395 (quoting *Jackson*, 678 F. App'x at 306). Applied to handcuffing, a suspect's mere failure to present

24

his arms to an officer is passive resistance, but struggling to avoid being placed in handcuffs may be deemed active resistance. *Id.* at 396 (quoting *Jackson*, 678 F. App'x at 307).

On one level, as Watts argues, his conduct could be considered passive. But it also displayed unmistakable features of active resistance, which encompasses "conduct that is perhaps intuitively not all that active[,]" including "'a deliberate act of defiance.'" *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 604 (6th Cir. 2025) (quoting *Wright v. City of Euclid*, 962 F.3d 852, 867 (6th Cir. 2020)); *see also Kent v. Oakland Cnty.*, 810 F.3d 384, 392 (6th Cir. 2016) ("Active resistance includes physically struggling with, threatening, or disobeying officers." (internal quotation marks omitted)). Although Watts was handcuffed, he committed deliberate acts of defiance by tensing up and falling to the ground and then refusing to stand up when the deputies attempted to lift him—all because he did not want to go to the hot cell. He also struggled with the deputies while they attempted to place him in the restraint chair and as they worked against his resistance and defiance of repeated orders to move back in the chair so that he could be strapped into the chair. *See Feagin*, 155 F.4th at 604 (noting that "[p]hysical struggles with the police qualify [as active resistance]"); *Rudlaff v. Gillispie*, 791 F.3d 638, 641–42 (6th Cir. 2015) (holding that the plaintiff actively resisted arrest where, among other things, he "locked up his body . . . and admittedly refused to give [the officer] his hands"); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 507, 509–11 (6th Cir. 2012) (decedent who lay down on the pavement with his arms locked and refusing to be handcuffed while wrestling with officers engaged in active resistance). Akin to handcuffing cases, Watts's physical struggle with the deputies here was to avoid being secured in the restraint chair.

Watts views the video evidence differently. He claims it shows that he was not resisting. Rather, he asserts that he could not comply because of the way the deputies were manipulating his

25

body, coupled with the fact that he was trying to breathe. (ECF No. 43 at PageID.511.) Watts's version, however, is roundly contradicted by the video evidence, which shows Watts holding his midsection out of the seat and refusing to sit back despite Sgt. Jelsomeno and the deputies' repeated commands to do so.[8] *Scott*, 550 U.S. at 381. Moreover, even if Watts's version could be credited notwithstanding the video, the Court must view Defendants' actions objectively, from the perspective of a reasonable officer on the scene. *Rudlaff*, 791 F.3d at 642. Given the chaotic nature of the incident, the number of KCJ staff needed to secure Watts into the chair, and Watts's clear intent to avoid the hot cell, reasonable officers could have interpreted Watts's conduct as resistance. Finally, it is important to bear in mind KCJ's "legitimate interests in managing a jail." *Whyde v. Sigsworth*, No. 22-3581, 2024 WL 4719649, at *8 (6th Cir. Nov. 8, 2024) (internal quotation marks omitted) (concluding that the defendant officer's "need to ensure order and security in the jail authorized him to use a takedown maneuver on an uncooperative inmate who refused to be handcuffed"). Watts's own defiant actions indisputably necessitated the use of force by KCJ staff.

In response to Defendants' assertion of qualified immunity, Watts fails to cite any binding case that is remotely close to these facts. None of the cases Watts cites pertained to a handcuffed pretrial detainee who engaged in the same behavior, *i.e.*, engaging in acts of defiance and physically struggling with officers without making verbal threats or being physically aggressive. The best case scenario for Watts, viewed in a light most favorable to him, is that his conduct resides in the murky "zone of twilight" that provides no clear guidance as to which side of the spectrum (active or passive) his conduct fell. *Feagin*, 155 F.4th at 604. In such case, "the 'proper course is

---

[8] ECF No. 30-30, Ex. CC at 13:53; Ex. EE at 3:17-4:21; Ex. FF at 1:54-2:00.

to grant summary judgment to the officers' on qualified immunity grounds." *Id.* (quoting *Rudlaff*, 791 F.3d at 644).

### 1.    Deputy Whisman

The only use of force by Deputy Whisman that Watts cites in his response is pulling or bending Watts's wrist backwards as he and the other deputies were attempting to stand Watts up. (ECF No. 43 at PageID.511.) Given the circumstances Watts created, the staff was entitled to use some force lift him back up. Pretrial detainees have no right to defy orders they do not like by sitting on the ground. Nothing in the video evidence indicates that Deputy Whisman gratuitously inflicted pain on Watts or used an unreasonable amount of force. (ECF No. 30-30, Ex. EE at 2:20-2:35.) Moreover, the force Deputy Whisman used was *de minimis* and did not result in any injury to Watts. Finally, Watts fails to cite any case holding that an officer violates a pretrial detainee's clearly established rights by lifting him up by his arms or hands when he refuses to stand.

### 2.    Sgt. Jelsomeno

Watts contends that Sgt. Jelsomeno is liable for three separate uses of force: (1) applying an ankle lock when he first encountered the situation; (2) pulling on his wrists along with Deputy Whisman while they were trying to stand him up; and (3) using three knee strikes to force Watts to move back into the seat.

Beginning with the ankle lock, Sgt. Jelsomeno rushed to the scene after Deputy Dennany called for him and found several deputies apparently struggling with Watts on the ground. He immediately applied the ankle lock. While Watts was handcuffed at the time with two or three deputies holding him on the ground, the video evidence shows that Sgt. Jelsomeno approached from behind and was unaware that Watts was in handcuffs. Given the circumstances he confronted, Sgt. Jelsomeno and could have reasonably believed that the situation involved a belligerent

prisoner and called for the use of some force to gain control. Furthermore, the video shows that Sgt. Jelsomeno released the ankle lock after the deputies told him that Watts was handcuffed. In other words, he applied a permissible amount of force for a legitimate purpose. *See Montiel v. County of Van Buren*, No. 1:25-cv-66, 2025 WL 913751, at *6 (W.D. Mich. Mar. 26, 2025) ("[S]imply alleging that a corrections officer used a pressure point to compel compliance does not support an inference that the officer used excessive force."); *Latimore v. Pickell*, No. 14-13997, 2016 WL 7439193, at *10 (E.D. Mich. Dec. 27, 2016) (force measures including pressure point compliance grips and peroneal strikes were reasonable uses force based on the plaintiff's resistance to attempts to search him and his failure to comply with verbal commands). Under the totality of the circumstances, a reasonable officer would not have known that use an ankle lock for several seconds violated any constitutionally protected rights. Contrary to Watts's argument, the Sixth Circuit's decision in *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009), would not have given Sgt. Jelsomeno notice that the ankle lock violated Watts's clearly established rights. In *Grawey*, the defendant officer grabbed and twisted the plaintiff's leg, using it as leverage to flip the plaintiff over on his stomach to be handcuffed, resulting in a broken ankle. *Id.* at 308. The court found that the defendant's "technique was not an objectively reasonable method for moving an unconscious and limp-bodied person from his back to his front, for the sole purpose of handcuffing him." *Id.* at 313. The court further held that twisting an unconscious detainee's leg with enough force to fracture his ankle was unreasonable. *Id.* Because nothing close to this happened here, *Grawey* cannot clearly establish the law.

Next, for the reasons discussed as to Deputy Whisman, Sgt. Jelsomeno's act of lifting Watts up by his hand and/or wrist to get him to the chair was not an unreasonable use of force.

Finally, the knee strikes Sgt. Jelsomeno employed to force Watts to move back into the seat so that the deputies could strap him in did not amount to an unreasonable use of force. As discussed above, Watts was struggling against the deputies' efforts to push him back into the chair and an officer could have reasonably perceived such conduct as active resistance. The Sixth Circuit has specifically held that an officer's use of knee strikes, or even a taser, in such situations is reasonable. *See King*, 97 F.4th at 395 (citing *Rudlaff*, 791 F.3d at 641–42). Sgt. Jelsomeno thus did not violate Watts's constitutional rights by administering the knee strikes.

### 3.    Deputy Marshall

Watts contends that Marshall's use of a hypoglossal pressure point hold in order to control Watts as he struggled constituted excessive force. Watts claims that Marshall's application of the of the hypoglossal technique was excessive because it created an asphyxiating condition that made it difficult for him to breathe. Watts cites *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013), for the proposition that an "officer may not employ 'substantial or significant' pressure' in a matter that creates asphyxiating conditions in order to restrain a subject who does not pose a danger to the officers or others and [is] not actively resisting." (ECF No. 43 at PageID.512 (quoting *Martin*, 712 F.3d at 961).) In *Martin*, officers used substantial force that far exceeded the level of threat that the suspect posed, including placing weight on his body while he was face down in order to handcuff him. *Id.* at 961. But *Martin* is inapplicable here for at least two reasons. First, Watts was actively resisting the deputies efforts to secure him into the restraint chair, necessitating the use of force to accomplish this task. As the video evidence clearly demonstrates, Deputy Marshall employed this pressure point technique not only to get Watts to move to the back of the chair, but also to prevent him from biting or using his head to injure the deputies who were working close to him to secure him in the chair. Second, the video evidence is clear that at all times, Deputy

29

Marshall's hands were on either side of Watts's throat and not obstructing or pressing against his airway. Moreover, in spite of Watts's complaints of not being able to breath during his struggle with the deputies, he suffered no discernable injury or ill effects as a result of Deputy Marshall's use of force. Thus, Deputy Marshall did not use an unreasonable amount of force on Watts.

### 4.      Deputies Crump, Ensor, and Whisman

Watts contends that Deputy Whisman failed to intervene in Sgt. Jelsomeno's use of knee strikes. He further contends that Deputies Ensor, Crump, and Whisman observed Deputy Marshall using the hypoglossal hold on Watts and heard him complaint about being unable to breathe, but failed to say or do anything.[9] (ECF No. 43 at PageID.513.) Because Sgt. Jelsomeno and Deputy Marshall did not violate Watts's constitutional rights by employing excessive force, Deputies Crump, Ensor, and Whisman had no duty to intervene and are entitled to summary judgment on this claim. *See Camarca v. City of Covington Police Dep't*, No. 25-5461, 2026 WL 297064, at \*7 (6th Cir. Feb. 4, 2026) ("Because Officer Woodward's and Officer Christen's 'conduct was not unconstitutional,' the other on-scene officers 'had no duty to intervene.'" (quoting *Harris v. Hofbauer*, No. 99-1338, 2000 WL 1175662, at \*1 (6th Cir. Aug. 10, 2000)))..

### IV.   Conclusion

For the reasons set forth above, I recommend that the Court **grant** Defendants' Motion for Summary Judgment (ECF No. 30) and **dismiss** Watts's complaint **with prejudice**.

Dated: July 2, 2026                                        /s/ Sally J. Berens
                                                          SALLY J. BERENS
                                                          U.S. Magistrate Judge

---

[9] Watts does not mention Deputy McKenzie in his failure-to-intervene argument, nor does he contend that Deputy McKenzie used excessive force on him. Thus, Deputy McKenzie should be dismissed from this action as Watts abandoned any claim against him.

## <u>NOTICE TO PARTIES</u>

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).